This case is Central States Southeast and Southwest Areas v. Event Media. Mr. Sullivan. Good morning, and may it please the Court, my name is Daniel Sullivan. I represent the Appellant Central States Southeast and Southwest Areas Pension Fund, as well as its designated trustee. The District Court committed two related legal errors in its opinion on the matter below. First, the statutory provision in question, 29 U.S.C. 1085 G3, does not contain the sort of blanket or general exception or exclusion of post-2014 contribution rate increases as the District Court described. To the contrary, there is actually a critical distinction that appears within the text of G3A, that only those contribution rate increases that are required or made in order to meet the requirements of the rehabilitation plan are those which are to be excluded. As we explain in our papers, that phrasing is used elsewhere in very similar fashion in the statute. Specifically, subsection E3A contains very similar phraseology to describe the requirement of a rehabilitation plan generally, which is to prevent or forestall insolvency. So, to use that same phrase or extremely similar phrasing... Well, what do you do about it? You're just ignoring 1085 G3B. I can get there right away, Your Honor. Yes. That's where you've got to go, right? I'm with you on A, right? But you've got to read B, too. I understand completely what Your Honor is saying. I do think the two clauses have to be read in harmony. And I do believe they reinforce one another, so let's get right there. To the extent that there is this concept of a rehabilitation plan required contribution rate increase, I think G3B does a pretty good job of telling you what that means. Specifically, G3B lists a number of contribution rate increases that should not be considered to be required by a rehabilitation plan. I believe they're all similar, and I believe that similarity is instructive. But the one that I would like to point to is the one that, of course, the parties have focused on. I believe it's the last one that appears in the list. Periods of time for which the contribution rate increases are used to provide an increase in benefits, including an increase in future benefit accruals. Here, I think we get into one of the linguistic disputes between the parties. Our position is effectively that what I just said, contribution rate increases that increase benefits, is really the load-bearing part of that part of the sentence. And that permitted by subsection F1B is really a clarifying note that prevents a sort of hole that might otherwise appear in the statute by allowing a plan to pass nonconforming amendments or otherwise get around the requirements of F1B. I don't think that it follows, however, that the permitted by F1B language becomes a freestanding additional requirement. It's not freestanding at all. It defines provide an increase in benefits. I mean, that would be a very odd way. Do you have any other – can you cite any other case where any court in America has ever read any statute that way? That is a broad question, okay? But that is an odd reading of a statute. Well, Your Honor, I have two answers. I have a literal one, which is no, I do not have another case that I can give you right now because I think the phrasing is unusual. But I think the unusual aspect of the phrasing, I think, is here again instructive where F1B does speak in terms of a narrow prohibition. And so to say that permitted by F1B doesn't have a lot of force here or doesn't necessarily change the words that came before it in the way that appellees suggest I think is the better reading. I think that by attempting to change what permitted by means in this context in order to better fit with this preconceived notion of F1B should mean or should say is probably the wrong course of action. But wouldn't – I mean, if we were to read it the way you're suggesting, B is totally meaningless, isn't it? It just says the exact same thing as A. I don't think – Because we're striking the – I mean, basically what you're telling us to do is strike the language permitted by Section D1B or F1B. They don't mean anything. It helps clarify the statute, but other than that, it's insignificant. So then we just read that put a period after to provide an increase in benefits, period. Then we just look at it, and it says the same thing as A, except it – what's the difference between A and B if we read it your way? Your Honor, I don't believe that the harmony between the two provisions is a sign of superfluity but rather of a well-drafted statute. To add just a little bit of color to this, the idea that central states had this 1 percent benefit accrual formula was certainly not a secret at the times that Congress was considering and drafting the MPRA. And so I do believe that the natural reading of the text does still support our position even if your Honor may disagree with the artfulness of the drafting in that respect. And to return then to what I was saying a moment ago, that the contribution rate increase formula that central states had has not been a secret. I do think it would be helpful to draw attention again to something we mentioned briefly in our papers, that rehabilitation plans rose not under the MPRA but rather under an earlier statute, the Pension Protection Act. The Pension Protection Act is relevant for at least two respects because, one, as the PBGC has opined and as we've discussed in our papers, this created a problem of a sort of double charging for unfunded vested benefits. And it is that problem and that problem alone that the MPRA was sought to solve. The second reason the PPA is relevant to your Honor's analysis is because it introduced these concepts of surcharges, which appear at G-2 of the statute. And if you compare the structure of G-2 to G-3, G-2 is the statute that functions and is written in the way that appellees describe G-3. It is very simple. It contains only one clause. It doesn't contain a Part A and B, and it merely says if it's a surcharge, take it out. That makes a lot of sense because surcharges are by definition not benefit-bearing under this area of the law and within this structure. So I believe that that difference is instructive, that here Congress did invite a more detailed analysis as to what the contribution rate increases in question actually do because when compared to surcharges under G-2, such an analysis is frankly not particularly fruitful, we'll say. And then I'd also like to just briefly address our alternative argument. To be clear, it is not my position that after Loeb or Bright or anything that this is binding, but to the extent that the Court is concerned about the larger structure of the pension system and the regulation of the pension system and policy goals that Congress had, I believe that is a particularly persuasive area for PBGC guidance and policymaking to come through. So to the extent that Your Honors do not agree with me on my primary argument, you think there's frankly something fishy here or something like that, I would direct Your Honors once again to the PBGC's statements. As we cited in the papers, it cannot be the case that Congress meant to put plans in this position where they have to increase benefits to stay competitive, but they're not allowed to actually fund those benefits either the first time or the second through withdrawal liability. So, Your Honors, with that said, unless there are further questions, I would respectfully like to reserve two minutes for rebuttal. No problem. Thank you, Mr. Schultz. Thank you very much. Mr. Daniels. Good morning, Your Honors. May it please the Court, my name is William Daniels and I appear on behalf of the appellees Event Media Inc. and PAC Expo LLC. The district court opinion in order vacating the arbitration awards, ordering the fund to recalculate the employer's withdrawal liability payments based on contribution rate in effect as of December 31st of 2014 should be affirmed. As the district court concluded here and in Royal Ice Cream, consistent with at least nine out of ten arbitrators before them, the unambiguous statutory text of 1085G3 requires that any post-2014 contribution rate increases must be disregarded for purposes of calculating employers' withdrawal liability payments. And the fund's interpretation and attempted application of the statute is contrary to the statute's plain language. The district court correctly found that the fund's calculations were inconsistent with the plain language of the statute when it applied post-2014 contribution rate increases, which were required under the fund's rehabilitation plan and not made pursuant to any subsequent amendment in calculating the employer's withdrawal liability payments. As the district court explained, if the statutory's language plain meaning is unambiguous, our inquiry ends here, quoting United States v. Melvin. The statute provides in relevant part the following. Any increase in the contribution rate that is required or made in order to enable the plan to meet the requirement of the rehabilitation plan shall be disregarded in determining the highest contribution rate. The contribution rate increases in this case were required under and a product of the fund's rehabilitation plan. Thus, under the clear text of Section 1085G3A, any such contribution rate increases must be disregarded for purposes of determining the employer's highest contribution rate. If 1085G3A were not clear enough to eliminate any doubt, the next paragraph in the statute mandates that, quote, any increase in the contribution rate shall be deemed to be required or made in order to enable the plan to meet the requirement of the rehabilitation plan. Unless one of two exceptions apply, neither of which is applicable under our facts. The district court properly explained that when read together, those two paragraphs make clear that any contribution rate increases that were required under the fund's rehabilitation plan are deemed required for the plans and thus disregarded when calculating the highest contribution rate for the withdrawal liability payments unless one of the statutory exceptions applies to the increase. The loan exception applicable here would be 1085F1B, which allows for an amendment to the plan to increase benefits, including future benefit accruals, where the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan. And after taking into account the benefit increases, the multi-employer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan. The parties agree that no such amendment was adopted in this case. Rather, the contribution rate increases and the benefit accruals resulting from these contributions were built into the fund's rehabilitation plan that was adopted in 2008. Those contribution rate increases compounded over the years to culminate in the 2019 contribution of $424 per week, which the fund attempted to apply here to calculate the employer's withdrawal liability payments. The fund's current benefit formula has been in place since 2004 when it was reduced from the prior formula that had been in effect since 1986. The fund argues that it meets the F1B exception because the additional contributions required under the fund's rehabilitation plan were not prohibited by F1B. But that argument, like all of the fund's arguments, ignores the clear text of the statute. The district court found that the interpretations proposed by the fund in this regard departed from the language of the statute. Thus, the district court held that F1B exception did not apply in this case because, quote, in the absence of a plan amendment certified by the plan's actuary, the exception for increased contributions permitted by Section F1B does not apply to the employers here. The fund's argument is an attempt to confuse the court and circumvent the requirements of F1B. The district court ultimately concluded that the exception for contribution increases permitted by Subsection F1B only applies to those increases actually described in F1B, amendments after the adoption of a rehabilitation plan certified by an actuary to meet certain requirements. In other words, since the exception under F1B does not apply, Section 1085G3 makes clear that any increase in the fund's contribution rate post-2014 that was made pursuant to the fund's 2008 rehabilitation plan must be disregarded for purposes of determining the employer's highest contribution rate and withdrawal liability payments in this case. The fund's primary position, which would result in inflated withdrawal liability payments, requires an interpretation of the relevant statute that is not supported by the text or any guidance thereunder. Instead, the fund's argument is supported entirely by its convoluted interpretation of the statutory language that renders such language barely decipherable. Likewise, the fund's alternative theory for applying a portion of the 2014 contribution rate increases in determining the employer's withdrawal liability payments finds no support in the statute or any binding authority, which is why the lower court here and at least 9 out of 10 arbitrators before were not persuaded. And the Northern District in the Royal Ice Cream case dismissed the argument entirely with nothing more than a footnote. The fund's argument in this regard relies entirely on incorrect paraphrasing of the PBGC's notes in the preamble to proposed regulations that were never adopted and ultimately were overruled by final regulations that track the statute. Given the unambiguous text of 1085G3B and F1B, this court need not take part in such exercises of statutory interpretation to glean the intent of the statute at issue. In conclusion, as the District Court concluded along with District Court and Royal Ice Cream and 9 out of 10 arbitrators before them, the statutory text of 1085G3 is unambiguous and the fund's attempted interpretation and application of the statute is contrary to the plain language. Section 1085G3A prohibits the application of the contribution rate increases for the purposes of determining the employer's highest contribution rate in this case and Section 1085G3B does not apply to provide an exception to that general exclusion. This conclusion is clearly supported by the clear text of the statute. Are there any questions? Thank you, Your Honors. I appreciate your time. Okay. Thank you, Mr. Daniels. Mr. Sullivan. Thank you again and may it please the Court. I endeavor to use less than my two minutes. I just have three quick points to make. First, as Mr. Daniels did say, our 1% accrual formula does predate the PPA and the other statutes in this case, so I disagree with the characterization that this is sort of a rehabilitation plan specific benefit accrual formula. Sort of relatedly, I also don't agree with the characterization that this artificially inflates withdrawal liability. We are still talking about benefits that have vested and are not funded. And UVB is at the heart of what withdrawal liability is intended to address. And so I disagree with the characterization that decreasing the relief that employers are entitled to under this statute constitutes some sort of artificial inflation. And then finally, I would just like to touch on F-1B again. As I mentioned a moment ago, we've had this 1% benefit accrual formula. The focus on amendments within F-1B is, I believe, instructive. I think if you view it within the context of the statute as a whole, it's really a status quo provision. Don't change what you were doing before in terms of benefit accruals unless you go through the amendment process and get an actuary. But you're not otherwise required to, as a plan, put yourself in a negative position by maintaining the status quo. And with that, Your Honors, unless there's any other questions, I will cede the remainder of my time. Okay. Thank you, Mr. Soule. Thank you very much. The case will be taken under advisement.